**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| HP / SUPERIOR, INC., and | ) | PROPOSED |
| SUPERIOR HEALTHCARE INVESTORS, INC., | ) | Jointly administered under |
| | ) | CASE NO. 14-71797-pwb |
| Debtors. | ) | |

**DEBTORS' MOTION (A) FOR AUTHORITY TO SELL ASSETS FREE AND CLEAR
OF LIENS, CLAIMS, AND ENCUMBRANCES (B) TO ASSUME AND ASSIGN
CERTAIN EXECUTORY CONTRACTS; (C) TO ESTABLISH PROCEDURES WITH
RESPECT TO SUCH SALE AND THE ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS, (D) TO CONSIDER APPROVAL OF BREAKUP FEE,
AND (E) TO SHORTEN AND LIMIT NOTICE**

**PARTIES TO CONTRACTS WITH THE DEBTORS SHOULD EXAMINE EXHIBIT 2
ATTACHED HERETO TO LOCATE THEIR NAMES AND CONTRACTS**

COME NOW HP/ Superior, Inc., d/b/a St. Francis in the Park ("**HP**") and Superior

Healthcare Investors, Inc., ("**SHI**"), debtors and debtors-in-possession (collectively, the "**Debtors**"

or "**Sellers**") in the above-styled proposed jointly administered case (the "**Case**"), by and through

the undersigned counsel, and submit this Motion pursuant to Sections 105(a), 363(b), (f) and (m),

and 365 of the Bankruptcy Code, and Bankruptcy Rules 6004, 6006, 9006 and 9007 and seek the

following relief:

(a)      entry of an order shortening notice and scheduling an expedited hearing (the

"**Procedures Hearing**") to consider (i) approval of certain bid protections (including a proposed

"Breakup Fee") for  Superior WI Realty, LLC or its permitted assignee (the  "**Initial Bidder**"), with

whom the Debtors have reached agreement,  subject to Court approval, to sell  substantially all assets

(the "**Identified Assets**") relating primarily to the 118 bed skilled nursing facility, in Superior,

Wisconsin (the "**Facility**) and the real estate on which the Facility is located,  pursuant to a definitive Asset Purchase Agreement to be substantially in the form of Exhibit "1" attached hereto (the "**Agreement**"); (ii) approving procedures for the assumption and assignment by Sellers to the Initial Bidder of certain executory contracts pursuant to the Agreement (collectively, the "**Assigned Contracts**"), including limited modifications of  the provisions of Bankruptcy Rule 6006; and (iii) scheduling an auction sale for said Identified Assets and establishing terms and conditions, including overbid procedures, for other interested bidders to submit higher and better offers for the proposed sale of the Identified Assets, all as more fully set forth below;

(b)  following the conclusion of the Procedures Hearing, entry of an order (i) approving the proposed bid protections and procedures and scheduling the proposed auction sale and (ii) scheduling a further hearing (the "**Sale Hearing**") to consider approval of any proposed Agreement with an Initial Bidder or any other bidder who shall have submitted the highest and best offer for the purchase of the Identified Assets (any such successful bidder being referred to herein as a "**Purchaser**"); and

(c)   following the conclusion of the Sale Hearing, entry of an order (i) approving an Agreement with the Purchaser, (ii) authorizing and approving the sale of  Identified Assets to any such Purchaser free and clear of all liens, claims, interests and encumbrances,  (iii) authorizing the Sellers to assume and assign to such Purchaser some or all of  the Assigned Contracts and fixing Cure Costs in connection therewith, and (iv) waiving the automatic 14-day stay following entry of such order under Bankruptcy Rules 6004(h) and 6006(d) in order to permit the Sellers to consummate immediately the sale of the Identified Assets and the assumption and assignment of the Assigned Contracts to Purchaser (the "**Sale Order**").

In support of this Motion, the Debtors respectfully aver as follows:

## Introduction

1.      On November 3, 2014, (the "**HP Petition Date**"), HP  filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  HP has continued in possession of its property and is operating its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On January 6, 2015, (the "**SHI Petition Date**"), SHI  filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  SHI has continued in possession of its property and is operating its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No trustee or examiner has been appointed in either of these bankruptcy cases.  No request has been made for the appointment of a trustee or examiner.

4.      On January 14, 2015, the Debtors filed a motion with the Court seeking joint administration of the two Chapter 11 Cases.  The joint administration motion is pending.

## Jurisdiction And Venue

5.      This Court has jurisdiction of this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N) and (O).  Venue of the Debtors' Chapter 11 Case and this Motion in this District is proper pursuant to 28 U.S.C. Sections 1408 and 1409.  The statutory predicates for the relief sought herein are Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9006 and 9007.

## Background

6.      Each of the Debtors is a Georgia corporation.  HP is the operator for the Facility and SHI owns the land and improvements on which the Facility is located.

7.     By this Motion, the Debtors seek entry of one or more orders following the conclusion of the Sale Hearing authorizing the Sellers to sell the Identified Assets, assume and assign the Assigned Contracts, and consummate such other related and necessary transactions in connection therewith as are summarized in this Motion and/or described in more detail in any Agreement with an Initial Bidder (or any other Purchaser approved by the Court) with such assets to be transferred and conveyed free and clear of all liens, claims, interests and encumbrances.

## Proposed Sale of Assets and Assumption and Assignment of Certain Executory Contracts to Purchaser

8.     Any proposed sale shall provide for the sale and assignment to a Purchaser of the Identified Assets of the Sellers, for a purchase price and on terms and conditions as set forth more fully in the underlying asset purchase agreement, to be substantially in the same form as the Agreement.[1]

9.     The sale of Identified Assets shall to be free and clear of any and all liens, claims, interests and encumbrances, with these to attach to the net proceeds generated from the sale of the Identified Assets, to the extent valid, perfected and enforceable, and such net sale proceeds shall be held in escrow by counsel for HP subject to further order of the Court.

10.     The Debtors anticipate that any proposed Agreement shall provide for the Sellers to assume most, if not all, of the Assigned Contracts and assign them to the Purchaser, as shall be more fully set forth in the Agreement itself.  The Assigned Contracts are identified more specifically on Exhibit 2 attached hereto.  Inclusion on said Exhibit should not be deemed an admission that such items are "executory" within the meaning of 11 U.S.C. § 365.

---

[1]     If there is any discrepancy between the terms contained in this Motion and the terms of the Agreement itself, the terms of the Agreement shall govern.

**Establishing Cure Costs**

11.    The Debtors, by this Motion, are also requesting that any objections by non-debtor parties to the Assigned Contracts to assumption and assignment be determined at the Sale Hearing. In assuming the Assigned Contracts, the Sellers and/or the Purchaser will cure defaults and/or pay all amounts (collectively, "**Cure Costs**"), if any, as required by Section 365(b) of the Bankruptcy Code and will provide adequate assurance of future performance by the Purchaser to whom the Assigned Contracts are being assigned. The Debtors have set forth on Exhibit 2 attached hereto the amounts of any Cure Costs believed and determined to be payable with respect to the Assigned Contracts based upon a review of the Sellers' books and records. The Debtors reserve the right to amend Exhibit 2. The Debtors request that, unless an objection to the proposed Cure Costs is properly and timely filed and served, the Court enter an order providing that: (i) the Cure Costs shall be fixed at the amounts shown on Exhibit 2 and shall constitute the entire amount necessary to cure and/or provide compensation for any defaults under Section 365(b) of the Bankruptcy Code. If an objection to a particular Cure Cost is timely filed and served, the Debtors request that the Court determine the disputed Cure Cost at the hearing on this Motion. The Cure Costs as are ultimately determined by the Court shall be paid as soon as practicable following the Closing on the sale of the Identified Assets, or on such other date as shall be determined by the Court.

12.    It shall be each prospective Purchaser's responsibility for providing evidence necessary for the Court to find that the assignee can provide adequate assurance of future performance of an Assigned Contract within the meaning of Section 365(b)(1)(C) of the Bankruptcy Code. Each prospective Purchaser will assume all obligations that arise after the closing date under each Assigned Contract to be assigned to that Purchaser. The Debtors will be

-5-

relieved of any post-assignment liability for any breach of an Assigned Contract in accordance with Section 365(k) of the Bankruptcy Code.

13.    Pursuant to Section 541 of the Bankruptcy Code, any Assigned Contracts are property of the Debtors' estates which may be sold and assigned consistent with Sections 363 and 365 of the Bankruptcy Code.

14.    The sale, assumption and assignment of Identified Assets and Assigned Contracts as proposed herein is reasonable and proper under Sections 363 and 365 of the Bankruptcy Code and is in the best interests of the Debtors, their creditors and their estates.  Accordingly, ample cause exists for the proposed sale, assumption and assignment of Identified Assets and Assigned Contracts.

## Miscellaneous Provisions

15.    The Debtors seek authorization to take such action and to execute and deliver any approved asset purchase agreement and such other documents, agreements and instruments as may be necessary or advisable to effectuate the terms thereof or any other Court approved sale, provided that the Sellers may not agree to any material modification to an approved asset purchase agreement or ancillary documents without order of the Court.

## Good Faith Purchaser Designation

16.    As part of the relief sought by the Debtors, the Debtors will ask the Court to designate any successful Purchaser as a good faith purchaser, as such term is utilized in Section 363(m) of the Bankruptcy Code.  Such designation can be made by a Bankruptcy Court in the context of a sale of assets of a debtor when it has been established that the proposed purchaser is an unrelated third party, not affiliated with or having any insider relationship with the debtor, and

when the proposed transaction is for fair value and is the result of arms length negotiations between the parties.  See  In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986).

17.     With respect to the proposed transactions, the Debtors anticipate that any Purchaser proposed will meet the qualifications for designation as a good faith purchaser in that: (a) they will not be affiliated in any way with the Debtors, and (b) they and their representatives will have negotiated in good faith and at arm's length with the Debtors' management.  It is expected that any Purchaser may make offers of employment to a number of the Debtors' employees, though there is not currently any definitive agreement, written or oral, between any Purchaser and any of the Debtors' employees.  Any discussions of the potential employment of employees of the Debtors by a Purchaser shall not, however, negatively affect the Debtors' negotiations or detract from the fairness of any proposed transaction.  See In re Integrated Resources, Inc., 147 B.R. 650, 659 (S.D.N.Y. 1992) (employment discussions between debtor's management and prospective buyer did not taint sale process so as to negate the application of the business judgment rule to the propriety of the sale transaction).

## Higher And Better Offers

18.     As discussed above, the Sellers have entered into the Agreement with the Initial Bidder, subject to approval by the Court as requested herein.  If the bidding procedures proposed herein are approved by the Court and the Debtors receive competing offers by the Bid Deadline (defined below), then prior to the Auction Sale (defined below), the Debtors will identify the highest and best offer, and such highest and best offer will be subject to overbid at the auction, as described in more detail below.

19.     Any entity who wishes to make an offer to acquire the Identified Assets is invited to conduct due diligence, at their own expense, prior to the Sale Hearing.  All bidders will be given

an equal and fair opportunity to gather information which they feel is necessary to formulate a bid for the acquisition of the Identified Assets, subject to the execution of a confidentiality agreement in form reasonably satisfactory to the Debtors.

### Best Interests Of The Estate

20.     The Debtors believe that the a sale of the Identified Assets as requested herein and set forth in detail in any Agreement with a proposed Purchaser will provide a significantly greater realization for Identified Assets than the liquidation value that would be obtained if the Identified Assets were not sold expeditiously in the manner requested herein and the Sellers' Businesses were forced to cease operations.

21.     Section 363(b) of the Bankruptcy Code provides that a debtor in possession ". . . after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Under the prevailing case law, a sale under Section 363(b) requires that the Court "expressly find from the evidence presented . . . a good business reason" to approve the sale. Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983).  Accord Stephens Industries, Inc. v. McClung, 789 F.2d 386, 389-90 (6th Cir. 1986); In re Titusville Country Club, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991).

22.     The Debtors believe, and therefore aver, that the present circumstances of this bankruptcy case warrant approval of the sale of the Identified Assets under the standard articulated in Lionel.  Thus, a sale of Identified Assets is appropriate as such transaction shall represent the exercise of sound business judgment on the part of the Debtors.

23.     Section 363(f) of the Bankruptcy Code provides, in pertinent part, as follows:

(f)  The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if --

- 8 -

(2)  such entity consents ; or

\*        \*        \*

(5)   such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. Section 363(f)(2), (5).

24.     The Debtors believe that approval of the proposed sale of Identified Assets to  the Initial Bidder (or any other successful Purchaser) comports with Section 363(f)(2) of the Bankruptcy Code in that all creditors asserting valid interests in and against Identified Assets will consent to the transaction.  To the extent that any creditor asserting a valid interest in and against Identified Assets does not consent to the sale, the Debtors believe that such creditor could be compelled to accept a money satisfaction of such interest in accordance with Section 363(f)(5) of the Bankruptcy Code.

25.     In addition, Section 105(a) of the Bankruptcy Code authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  The purpose of Section 105(a) is to insure a Bankruptcy Court's power to take whatever action "is appropriate or necessary in aid of the exercise of its jurisdiction." 2 Collier on Bankruptcy, 105.01, at 105-2 (15th ed. 1993).  Thus, this Court may exercise its equitable powers to grant the relief requested in this Motion.

26.     Finally, approval of a sale transaction as contemplated herein will help facilitate the Debtors' ability to file and seek approval of one or more Chapter 11 plans and distribute the sale proceeds in accordance with the priorities delineated in the Bankruptcy Code.

**Breakup Fee To Initial Bidder**

27.    The Initial Bidder has invested substantial time and effort in negotiating the material terms of the Agreement with the Debtors.  The Initial Bidder also has invested time and effort in connection with its investigation of the Debtors and its due diligence review.  It has incurred various legal and other professional costs and expenses, and will incur still further substantial additional fees and costs in its continuing due diligence investigations.  Subject to the terms of the Agreement reached with the Initial Bidder, if a closing occurs with respect to a sale of Identified  Assets to a party other than the Initial Bidder with respect to such assets, and the Initial Bidder is ready, willing and able to close the transaction and is not in default under the Agreement,  the Debtors propose that the Initial Bidder be paid a "Breakup Fee" in an amount equal to sixty-nine thousand six hundred dollars ($69,600.00).   The Breakup Fee would be paid in the event of the closing of a sale of Identified Assets to a party other than the Initial Bidder for such assets, concurrently with said closing.  The Debtors' obligation to pay a Breakup Fee to the Initial Bidder would  be allowed as an administrative expense claim in each of the Debtors' Chapter 11 cases pursuant to 11 U.S.C. §§ 503(b) and 507(a)(1) as an actual, necessary expense to preserve the value of the bankruptcy estate.

28.    Sellers of assets often employ buyer protections in order to encourage the making of other purchase offers.  These protections are "important tools to encourage bidding and to maximize the value of the debtor's assets."  In re Integrated Resources, Inc., 147 B.R. 650, 659 (S.D.N.Y. 1992).   The Debtors submit that the proposed Breakup Fee will not hamper or deter competitive bidding for the Identified Assets.  Rather, it has encouraged bidding by providing prospective purchasers with an incentive to bid for the Identified Assets and will likely serve as a magnet for other bids.  Moreover, the Debtors believe that the ability to provide a break-up fee has

enhanced the Debtors' ability to attract the Initial Bidder, which has set a guaranteed floor price for the Identified Assets, and that it will motivate other potential bidders to participate.

## **Bid Procedures**

29.      In order to ensure that asset values are truly maximized, the Debtors request that the Court approve the following bid procedures at the Procedures Hearing, so that competing offers for the Identified Assets shall be accepted only if they meet the following requirements:

(a)      Persons or entities other than the Initial Bidder wishing to make a competing bid for any or all of the Identified Assets  (a "**Proposed Bid**") shall submit bids in the form of a written asset purchase agreement (the "**Proposed Agreement**") to the Debtors no later than February 23, 2015 (or such other date as approved by the Court) (the "**Bid Deadline**"), together with an earnest money deposit (the "**Deposit**") in an amount no less than five (5%) percent of the proposed purchase price, and must also provide proof of  financial ability to close on the transactions described in the Proposed Agreement, including proof of financial ability to perform under the Assigned Contracts (as defined in the Motion) under Section 365 of the Bankruptcy Code.  The Proposed  Bid, including, without limitation, the Deposit and an original counterpart of the executed Proposed Agreement, should be delivered to Doug Mittleider, 5174 McGinnis Ferry Road, Suite 195, Alpharetta, GA 30006, with a copy to counsel for HP at c/o Ashley R. Ray, Scroggins & Williamson, P.C., 1500 Candler Building, 127 Peachtree Street, NE, Atlanta, Georgia  30303 and a copy to counsel for SHI at c/o G. Frank Nason, IV, Lamberth, Cifelli, Stokes, Ellis &

Nason, P.A., 3343 Peachtree Road, NE, Suite 550, Atlanta, GA 30326;

(b)      Any competitive bid must also conform to the following requirements:

(1) provide for a closing date on the sale which is no later than 75 days after entry

of the Sale Order; (2) contain substantially the same (or more favorable) terms and

conditions as those contained in the Initial Bidder's Agreement regarding the

Identified Assets (attached hereto as Exhibit "1"); (3) not contain any due diligence

conditions or a financing contingency; (4) proffer a competing bid which is greater

than the purchase price contained in the Initial Bidder's Agreement by at least

$125,000.00; and (5) by its terms, remain open for acceptance through entry of any

Sale Order;

(c)      On or before the close of business on February 25, 2015 (or such other date

as approved by the Court), the Debtors shall review the Proposed Bids, and the

Debtors shall notify the prospective competing bidders if their bids satisfy the

criteria required to participate in an auction sale regarding the Identified Assets

(each such bidder and any Initial Bidder being referred to herein as an "**Eligible**

**Bidder**").   The Debtors shall be entitled to extend the deadline for a prospective

competitive bidder to comply with the eligibility requirements if they determine

that such party is working in good faith to comply and appears to have the ability to

do so.   Once Eligible Bidders have been identified, upon request financial

information regarding such parties will be made available to the non-Debtor parties

to proposed Assigned Contracts;

- 12 -

(d)      All Eligible Bidders must attend an auction sale to be conducted by counsel for the Debtors beginning at 10:00 a.m. EDT on February 27, 2015 (or such other date as approved by the Court) (the "**Auction Sale**"), at  a location to be identified in the notice of the Sale Hearing to be served on interested parties;

(e)      At the Auction Sale, (i) bidding for Identified Assets will be conducted in minimum incremental bids of $25,000 (or such smaller or larger increment as the Debtors deem appropriate under the circumstances), and (ii) in the event there are bids on different Identified Assets which overlap, the Debtors shall be entitled to conduct the bidding by lot and also combined bids.  For the avoidance of doubt, the Debtors shall have complete discretion to structure the auction and the bidding in a manner it deems necessary to maximize value for creditor constituencies;

(f)      Following the conclusion of bidding and prior to the Sale Hearing, the Debtors shall determine which bid or combination of bids generate the greatest amount for the Debtors' estates, and identify one or more proposed Purchasers and Agreements to recommend for approval by the Court at the Sale Hearing as constituting the highest and best offers; and

(g)      At the Sale Hearing, the Debtors shall seek Court approval for the sale of Identified Assets and assumption and assignment of Assigned Contracts to one or more proposed Purchasers on terms and conditions as set forth in any Agreement reached with such prospective Purchasers, and the Debtors shall also seek approval of one or more back-up bids.

30. The Debtors further request that the Court require that any examination by a prospective bidder of the assets and other financial information relative to the transaction be conducted prior to the Sale Hearing at mutually convenient dates and times by contacting the undersigned counsel for the Debtors. Such inspections should be conducted in a manner which is not disruptive to the Debtors' business. The Debtors may request that prospective bidders be required to execute a confidentiality agreement in form reasonably satisfactory to the Debtors prior to conducting any due diligence or obtaining information considered confidential by the Debtors. In addition, any bidder should be required, within twenty-four (24) hours after the Debtors' request, to submit financial statements and other documents relating to its business activities and its ability to perform in the event that its bid is accepted.

31. The Debtors also asks the Court to direct that offers made prior to or at the Sale Hearing may not be withdrawn after they are made and any entity's refusal or failure to comply with its offer after acceptance of same by the Debtors and approval by the Court shall entitle the Debtors to retain its Deposit.

32. Finally, the Debtors reserve the right to reject any proposed higher and better offer which, in their discretion, is deemed inadequate or insufficient or which is contrary to the best interests of the estates. The Debtors intend to submit any disputes which may arise in connection with the bidding process to the Bankruptcy Court for determination on an expedited basis.

33. Simultaneously herewith, the Debtors have served a copy of this Motion, along with exhibits, on the Office of the United States Trustee, all non-debtor parties to any potential Assigned Contracts, counsel for the Initial Bidder, all parties identified on the creditors matrix

maintained in these cases, and all parties believed by the Debtors to assert a security interest in any of the Identified Assets.

### Modification of Rule 6006 Procedures

34.    The 2007 amendments to the Federal Rules of Bankruptcy Procedure added certain additional procedural requirements to Bankruptcy Rule 6006 which apply where the debtor seeks to assume and assign a number of executory contracts and unexpired leases in one motion. Subdivision (e) provides, in pertinent part, that the a debtor may not seek to assign multiple executory contracts or unexpired leases in the same motion unless they "are to be assigned to the same assignee," or "the court otherwise authorizes the motion to be filed."    Subdivision (f), in turn, prescribes specific requirements to be followed when such motions are authorized:

 *(f) Omnibus Motions*

*A motion to reject or, if permitted under subdivision (e), a motion to assume or assign multiple executory contracts or unexpired leases that are not between the same parties shall:*

*(1) state in a conspicuous place that parties receiving the omnibus motion should locate their names and their contracts or leases listed in the motion;*

*(2) list parties alphabetically and identify the corresponding contract or lease;*

*(3) specify the terms, including the curing of defaults, for each requested assumption or assignment;*

*(4) specify the terms, including the identity of each assignee and the adequate assurance of future performance by each assignee, for each requested assignment;*

*(5) be numbered consecutively with other omnibus motions to assume, assign, or reject executory contracts or unexpired leases; and*

*(6) be limited to no more than 100 executory contracts or unexpired leases.*

35.    Notwithstanding the mandatory language utilized, the Advisory Committee Report regarding the 2007 amendments to Rule 6006 indicates that bankruptcy court retains flexibility to

modify the specific requirements of Subdivision (f) to meet the needs of a particular case, so long as effective notice is provided to the non-debtor parties to the contracts or leases to be assigned.

> "*An omnibus motion to assume, assign, or reject multiple executory contracts and unexpired leases must comply with the procedural requirements set forth in subdivision (f) of the rule, unless the court orders otherwise. These requirements are intended to ensure that the nondebtor parties to the contracts and leases receive effective notice of the motion. . . .*"

36.    In the instant case, the Debtors believe they have complied (or shall comply) substantially with the requirements of  Bankruptcy Rule 6006 for the assumption and assignment of multiple contracts and leases, in that (a) the Debtors propose to assign all Assigned Contracts to a single assignee to be identified prior to the Sale Hearing, (b)  the statement required by Bankruptcy Rule 6006(f)(1) is set forth on page 1 above, in bold type and capital letters, immediately following the caption, (c) Exhibit 2 lists non-debtor  parties to the Assigned Contracts in alphabetical order and identify the corresponding contract, (d)  proposed Cure Costs are identified on Exhibit 2 attached hereto, (e)  any successful Purchaser at the Auction Sale will be required to provide at or before the Sale Hearing sufficient information for non-debtor parties to determine the Purchaser's ability to provide adequate assurance of performance under the Assigned Contracts, (f) this Motion is designate as the "First" such motion, and any further motions seeking authority to assume and assign multiple contracts or leases will be numbered consecutively, and (g) there are less than 100 proposed Assigned Contracts.  It is possible; however, that the Debtors may receive bids from multiple parties for a subset of the assets which could include the assumption and assignment of contracts to multiple parties.  To the extent the Debtors' proposal for assumption and assignment fails technically to comply with all of the requirements of the Rule, such variance is not material.     Under the circumstances, the procedures proposed under the Debtors' Motion substantially comply with

Bankruptcy Rule 6006 and will provide effective notice to non-debtor parties to the Assigned Contracts.  Therefore, the Debtors ask that the Court approve and authorize at the Procedures Hearing the proposed method of proceeding under the Motion with respect to the Assigned Contracts.

### Notice - Expedited Consideration

37.    The Debtors are submitting herewith a proposed Order and Notice of Hearing shortening notice and providing notice of the proposed sale procedures and the Procedures Hearing scheduled to consider same, which the Debtors propose to serve on the Office of the United States Trustee, all non-debtor parties to any Assigned Contracts, all parties identified on the creditors matrix maintained in this case, and all known creditors asserting a security interest in the Identified Assets.

38.    Federal Rule of Bankruptcy Procedure 6004 provides, in pertinent part, as follows:

(a)  Notice of Proposed Use, Sale, or Lease of Property.  Notice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k) . . . .

Fed.R.Bankr.P. 6004.

39.    Federal Rule of Bankruptcy Procedure 9007 provides, in pertinent part, as follows:

When notice is to be given under these rules, the court shall designate, if not otherwise specified herein, the time within which, the entities to whom, and the form and manner in which the notice shall be given.

Fed.R.Bankr.P. 9007.

40.    The Debtors contend that the forms of notice set forth above and the period for scheduling the hearing on the sale comport with Bankruptcy Rules 6004, 6006 and 9007, constitute

good and sufficient notice of the relief sought herein, and of all hearings and procedures contemplated hereby.

## **Waiver of 14-Day Stay on Closing**

41.    Bankruptcy Rules 6004(h) and 6006(d) respectively provide that an order authorizing the use, sale, or lease of property and an order authorizing the assumption and assignment of executory contracts or unexpired leases will be stayed for fourteen days after entry of such approval orders unless the court orders otherwise.  Because of the need to close the transactions contemplated herein as promptly as possible, the Debtors request that the Court order and direct that the order approving this Motion shall <u>not</u> be automatically stayed for fourteen days.

42.    No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that the Court grant this Motion and enter one or more orders providing relief as requested hereinabove, and  granting such other and further relief as may be just and proper.

This 14th day of January, 2015.

                                      Respectfully submitted,

                                        SCROGGINS & WILLIAMSON, P.C.

1500 Candler Building  
127 Peachtree Street, NE          /s/ Ashley R. Ray  
Atlanta, GA 30303              J. ROBERT WILLIAMSON  
T:   (404) 893-3880          Georgia Bar No. 765214  
F:   (404) 893-3886          ASHLEY REYNOLDS RAY  
E:   rwilliamson@swlawfirm.com   Georgia Bar No. 601559  
       aray@swlawfirm.com

                                        *Counsel for HP/ Superior, Inc.*

                                        *-and-*

                                        LAMBERTH, CIFELLI, STOKES ELLIS & NASON, P.A.

3343 Peachtree Road, N.E.  
East Tower, Suite 550  
Atlanta, Georgia  30326-1009      /s/ G. Frank Nason, IV  
T:   (404) 262-7373          G. FRANK NASON, IV  
F:   (404) 262-9911          Georgia Bar No. 535160  
E:   fnason@lcsenlaw.com

                                          *Counsel for Superior Healthcare Investors, Inc.*

**EXHIBIT "1"**

# ASSET PURCHASE AGREEEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Agreement") dated January 14, 2015 (the "Effective Date") is executed by **HP/SUPERIOR, INC.,** a Georgia corporation ("HP"), and **SUPERIOR HEALTHCARE INVESTORS, INC.,** a Georgia corporation ("Superior" and together with HP, the "Sellers"), and **Superior WI Realty, LLC**, a Delaware limited liability company (the "Purchaser").

## RECITALS:

**Whereas,** Sellers own and operate a 118 bed skilled nursing facility located at 1800 New York Avenue, Superior, Wisconsin 54880 (the "Nursing Home"), which is located on the improved real property described in Exhibit "A" to this Agreement (the "Project Land" and together with the Nursing Home, the "Facility"); and any improvements, together with all cash and non-cash proceed thereof, and all other revenues, income, receipts, and money received or receivable.

**Whereas,** HP is currently operating the Nursing Home as a Debtor-in-Possession in Chapter 11, Case No. 14-71797-pwb (the "HP Case"), filed on November 3, 2014, in the United Stated Bankruptcy Court for the Northern District of George, Atlanta Division (the "Court").

**Whereas,** Superior holds title to the Project Land on which the Facility is operated, and leases to HP the Project Land and various items of personal property utilized in the operation of the Facility, and Superior is a Debtor-in-Possession in Chapter 11, Case No. 15-50439-pwb, filed on January 6, 2015, in the Court (the "Superior Case").

**Whereas,** the HP Case and the Superior Case (collectively, the "Cases") are being jointly administered.

**Whereas,** Sellers desire to sell their interest in the Facility through the use of auction procedures under 11 U.S.C. § 363 to be approved by the Court in the Cases.

**Whereas,** Sellers and Purchaser desire to enter into this Agreement in order for Purchaser to serve as a "stalking horse bidder" in Sellers' auction of the Facility.

**Whereas,** subject to the terms of this Agreement and subject to the terms of the Bidding Procedures Order (as defined in Section 2.2 herein) and the Sale Approval Order (as defined in Section 3.1 herein), described herein, when issued, Sellers desires to sell to Purchaser, and Purchaser desires to purchase from Sellers the Purchased Assets (as defined in Section 1.1 herein).

**Whereas,** Purchaser intends to lease the Facility to Superior WI Management, LLC, a Delaware limited liability company (the "New Operator").

**Now, therefore,** in consideration of the mutual representations, warranties, covenants and agreements hereinafter contained, the parties hereto, each intending to be legally bound hereby, agree as follows:

## ARTICLE I – CONVEYANCE AND ACQUISITION

1.1    <u>Agreement to Convey and Acquire.</u>    Subject to the terms and conditions set forth in this Agreement, at the Closing Date (as defined in Section 3.1 herein), Sellers shall sell, contribute, convey, assign, transfer and deliver to Purchaser, free and clear of all liens (other than Permitted Exceptions (as defined in Section 1.8(c) herein)), and Purchaser shall purchase, acquire and take assignment and delivery from Sellers, for the consideration and in the manner specified herein, all rights, titles and interests of any kind and nature in and to all the properties, assets and rights of every kind and nature of Sellers, including existing licenses and permits, equipment, furniture, motor vehicles, and other tangible personal property and intangible property, plus all land, buildings, and fixtures necessary to operate the Nursing Home as a duly licensed 118 bed skilled nursing facility in Superior, Wisconsin (the "<u>Purchased Assets</u>") other than the Excluded Assets (as defined in Section 1.2 herein).  At Closing (as defined in Section 3.1 herein), Sellers shall provide  (a) a Bill of Sale, the form of which is attached hereto as <u>Exhibit "B"</u> (the "<u>Bill of Sale</u>"), conveying all of Sellers' right, title, and interest and to all of the Purchased Assets, and (b) a Limited Warranty Deed, the form of which is attached hereto as <u>Exhibit "C"</u> (the "<u>Deed</u>"), conveying all of Superior's right, title, and interest in and to the land, improvements and fixtures included in the Purchased Assets.

1.2    <u>Excluded Assets.</u>    Anything in this Agreement to the contrary notwithstanding, the Purchased Assets shall not include any of the assets described in the list of assets attached as <u>Exhibit "D"</u> hereto, including, without limitation, cash on hand, causes of action, and accounts receivable (the "<u>Excluded Assets</u>").

1.3    <u>Transfer of Resident Trust Funds and Property.</u>

      a.    **Resident Trust Funds**.  On or prior to the Closing Date, Sellers shall provide to New Operator a true, correct and complete accounting (properly reconciled), certified as being true, correct and complete by Sellers, of any patient trust funds, if any, held by Sellers prior to the Closing Date for residents at the Facility (the "<u>Resident Trust Funds</u>").

      b.    **Transfer and Assumption**.  Sellers hereby agree to transfer to New Operator the Resident Trust Funds on the Closing Date.  Sellers shall comply with all governmental statutes, rules and regulations with respect to the transfer of such Resident Trust Funds.  New Operator hereby represents, warrants and agrees that they will accept and hold the Resident Trust Funds in trust for the residents, and shall comply with all applicable statutes, rules and regulations.

1.4     Purchase Price.

(a)     Purchaser's initial bid for the Purchased Assets shall be Two Million Three Hundred Twenty Thousand and 00/100 Dollars ($2,320,000.00) (the "Initial Bid"), subject to the credits and prorations set forth in this Agreement.

(b)     If Purchaser is the successful bidder at the Auction (as defined in Section 2.1 herein), on the Closing Date, Purchaser shall transfer to Sellers the amount of the Initial Bid, subject to the credits and prorations set forth in this Agreement (the "Purchase Price"), less the Purchaser's Deposit (as defined in Section 1.6 herein), in immediately available funds, as set forth more fully in Section 3.2 (c) below.

1.5     Liabilities Not Assumed by the Purchaser.  Purchaser shall not be the successor to any liabilities of either Seller, and Purchaser shall not assume or incur any liability, expense, or obligation of any kind associated with (a) the Facility with respect to time periods on or prior to the Closing Date, (b) the operation of the Facility on or prior to the Closing Date, (c) the Facility for acts or omissions or business activities occurring on or prior to the Closing Date, (d) claims against or liability that relate to any of the Excluded Assets, or (e) liabilities for taxes  (other than transfer taxes) imposed on or with respect to the Purchased Assets for any pre-Closing tax period.

1.6     Good Faith Deposit.  Concurrently with the execution of this Agreement, Purchaser shall pay to Sellers a good faith deposit in the amount of One Hundred Sixteen Thousand and 00/100 Dollars ($116,000.00) (the "Purchaser's Deposit") by wire transfer of immediately available funds.  Purchaser's Deposit shall be held in a separate escrow account under the custody and control of Sellers or their counsel. The provisions of this Section will be incorporated into the Bidding Procedures Order described in Section 3.2, and such Bidding Procedures Order shall provide that the Purchasers Deposit shall not be deemed to constitute property of bankruptcy estate of HP (the "HP Estate") or the bankruptcy estate of Superior (the "Superior Estate" and collectively with HP Estate, the "Sellers' Estate"), and the Sellers' Estate shall have no interest of any kind (equitable or otherwise) in the Purchaser's Deposit unless and until such deposit is actually paid or payable to Sellers in accordance with this Agreement.  If the Closing occurs, then the Purchaser's Deposit shall be paid to Sellers in accordance with Section 3.2 (c) hereof.  If Purchaser is the winning bidder at the auction, the Court approves the sale contemplated herein, and the Closing does not occur, then the Purchaser's Deposit shall become nonrefundable subject to Section 9.5.4 and shall become property of the Sellers Estate if (a) Purchaser fails to close the transactions contemplated by this Agreement on the Closing date in accordance with Article II hereof after all conditions contained in Article VI hereof have been satisfied or (b) the Purchaser fails to satisfy each of the conditions to Sellers's obligation to close set forth in Article VII hereof on the Closing Date.  Sellers shall return Purchaser's Deposit to Purchaser if any of the following events occur:  (A) if the Bidding Procedures order described in Section 2.2 is not approved by the Court on or

before 5:00 p.m., prevailing Eastern time, on the thirtieth (30th) day following the Effective Date and Purchaser terminates this Agreement in writing on account thereof, (B) if Purchaser is not the successful bidder at the Auction, (C) Purchaser is the successful bidder at the auction, but the court does not approve the sale of the Purchased Assets to the Purchaser, or (D) Purchaser terminates this Agreement pursuant to Section 9.5.1(b).

1.7     Prorations and Credits.    The following will be prorated as of the Closing Date and shall be settled by a credit against the Purchaser Price at the Closing:

(a)     **Taxes**.  Accrued but unpaid general real estate and other ad valorem and special taxes affecting the Purchased Assets and any other real and personal property taxes, if any, for all years prior to the Closing Date.

(b)     **Utilities**. Sellers shall pay all utility charges attributable to the Purchased Assets through and including the day preceding the Closing Date. Charges and deposits for water, fuel, gas, oil, heat, electricity and other utility and operating charges and prepaid service contracts will be based upon the last available invoice.   Sellers will obtain final utility meter readings as close as possible to the Closing Date.

(c)     **Recapture Credit.**  Sellers shall provide a credit in such amount as shall be mutually agreed by Sellers in good faith prior to the Closing, not to exceed Fifty Thousand and 00/100 Dollars ($50,000.00), to provide for the Recapture Claims (as defined in Section 1.9(c) herein) made after the Closing for the Facility with respect to the period prior to Closing.

(d)     **PTO Credit**.  Seller shall provide a credit in such amount as shall be agreed upon between Sellers and Purchaser at or before the Closing to account for the PTO as defined and described in Section 5.2(c) herein.

1.8     Title and Survey.

a.     **Title Policies**.  Purchaser shall be responsible for obtaining, at its sole discretion, a commitment to issue the Owner's Title Insurance Policies for the Facility ("Title Commitment") from a title insurance company to be selected by Purchaser (the "Title Company") which will be updated to reflect the amount of the Purchase Price, showing title to the Purchased Assets in Seller.  The cost of the Title Commitment and the basic owner's title insurance policies in the amount of the Purchase Price issued therefrom ("Title Policy") shall be the sole responsibility of Purchaser.  Purchaser may obtain, at its own cost, the available title endorsements or deletions ("Title Endorsements").  To the extent the issuance of the Title Endorsements require extra documentation or inspection, other than the Survey (as defined in Section 1.8(b) herein), Sellers covenant to cooperate, at no expense to Sellers, with Purchaser in obtaining these documents or inspections prior to the Closing.

4

b.      **Survey**.  Sellers have provided to Purchaser any existing surveys of the Purchased Assets that Sellers have in their possession (the "Survey"). Purchaser may have the Survey updated or recertified at Purchaser's sole cost and expense.

c.      **Permitted Exceptions and Removable Exceptions**.  The term "Permitted Exceptions" shall mean: (i) the liens of real estate taxes, water, rent and sewer charges or municipal utility district charges, property association assessments that are not yet due and payable on the Closing Date and for which a credit against the Purchase Price at Closing has been given to Purchaser; (ii) the standard printed exceptions; (iii) those matters disclosed by the Survey or the Title Commitment and listed in **Schedule 1.8**.

1.9   **MEDICARE   PROVIDER   NUMBERS;   FINAL   COST   REPORTS; RECAPTURE CLAIMS**.

a.      **Medicare Provider Numbers**.  Effective on the Closing Date and to the extent assignable, Sellers shall sell, assign and convey to New Operator the Medicare provider numbers in use at or in connection with the Facility (the "Existing Medicare Provider Number").  New Operator shall be permitted to bill under the Existing Medicare Provider Number during the period commencing on the Closing Date and through the date of the issuance of the Medicare tie-in-notice.  Sellers shall execute any and all documents necessary to and will otherwise cooperate in connection with the assignment of the Existing Medicare Provider Numbers.  Notwithstanding the foregoing, Sellers retains any and all rights and liabilities relating to the Existing Medicare Provider Number for any and all periods prior to the Closing Date; provided such liabilities are not a result of Purchaser's or New Operator's actions or inactions.

b.      **Final Cost Reports**.  Sellers shall prepare and file with the appropriate Medicare and Medicaid agencies their final cost reports with respect to its operation of the Facility prior to the Closing Date required to be filed pursuant to Titles XVIII and XIX of the Social Security Act prior to the expiration of the period of time as may be required by law for the filing of each such final cost report under the applicable third party payor program, it being specifically understood and agreed that the intent and purpose of this provision is to ensure that the reimbursement paid to New Operator for the period beginning on the Closing Date is not delayed, reduced or offset in any manner as a result of Sellers' failure to timely file such final cost reports.  Sellers shall use commercially reasonable efforts to modify on or before thirty (30) days following the Closing Date, any existing direct deposit arrangement which Sellers have in connection with the operation of the Facility so that such funds are delivered to New Operator after such date.

c.    **Recapture Claims**.  New Operator shall notify Sellers as soon as practicable and Seller shall notify New Operators within five (5) business days after receipt of any notice of any claim by the Wisconsin Department of Health Services ("DHS"), the United States Department of Health and Human Services Center for Medicare and Medicaid Services ("CMS"), or any other governmental or quasi-governmental agency for withholding, recoupment, repayment, recapture or recovery of or penalty related to any alleged overpayment by Medicaid or Medicare or any alleged underpayment of any tax and/or assessment, including but not limited to, bed taxes or assessments or any associated penalties (collectively, "Recapture Claims") for services rendered for the periods prior to the Closing Date.  Sellers shall have no obligation with respect to any Recapture Claim that is raised after Closing.

1.10    **CONTRACTS; RESIDENT AGREEMENTS; ASSUMED LIABILITIES**.

a.    **Contracts**.  No later than ten (10) days following entry of the Bidding Procedures Order, Sellers shall deliver to New Operator true, accurate and complete copies of all material written equipment leases, service or maintenance contracts and agreements or other agreements affecting the Facility, including, without limitation, any pharmacy, therapy, managed care and employment contracts, exclusive of Resident Agreements (as defined in Section 1.10(c) herein) (collectively, the "Contracts"). In accordance with the terms of the General Assignment, Sellers shall assign to Purchaser and/or New Operator all of Sellers' rights, title and interest in, to and under the Contracts set forth by Purchaser in **Schedule 1.10.c** hereto, including that certain Kitchen Lease Agreement between HP and Royalton Manor LLC, dated May 1, 2006, as amended (collectively, the "Assumed Contracts," and the Contracts not assigned to Purchaser and/or New Operator shall be referred to as the "Rejected Contracts"). Schedule 1.10(c) may be amended at any time until entry of the Sale Approval Order.

b.    **Assumed and Rejected Contracts**.  Neither Purchaser nor New Operator shall be responsible for any debts, liabilities and obligations under any Contracts, except for liabilities arising after the Closing with respect to any Assumed Contract and result from the failure of Purchaser and/or New Operator to fulfill its obligations pursuant to such Assumed Contract. Sellers shall remain responsible for all liabilities and obligations (i) under the Rejected Contracts, (ii) under the Assumed Contracts to the extent such liabilities and obligations accrue or arise on or prior to the Closing Date, or (iii) for services or supplies which were performed or rendered prior to the Closing Date, and shall indemnify and hold Purchaser and/or New Operator harmless on account of the same.

c.    **Resident Agreements**.  Sellers shall also transfer, convey and assign to New Operator on the Closing Date all existing agreements with residents and, to the extent assignable, any guarantors thereof (the "Resident Agreements").

## ARTICLE II – ACTIONS IN THE CASES

2.1     Auction.  In accordance with the Bidding Procedures Order, Sellers will sell the Purchased Assets at a public auction (the "Auction") utilizing the procedures specifically set forth the sale procedures set forth in such Bidding Procedures Order.

2.2     Bidding Procedures.  Promptly following the Effective Date, Sellers will file a motion (the "Sale Motion") with the Court in the Cases, in form and substance approved by Purchaser, for entry of an order (the "Bidding Procedures Order") approving the transaction contemplated hereby and the procedures for bidding at the Auction in  form reasonably acceptable to counsel for Purchaser (the "Bidding Procedures").

> 2.2.1    Sellers shall deliver or cause to be delivered to Purchaser for review and comment, as soon as commercially reasonable and in any event not less than one (1) full business day prior to filing, all documents to be filed on behalf of Sellers with the Court, including all motions, applications, petitions, schedules and supporting papers prepared by Sellers (including forms of orders and notices to interested parties) that relate to the transactions contemplated in the Agreement, prior to the filing thereof.  All motions, applications, petitions, schedules and supporting papers prepared by Sellers and relating (directly of indirectly) to the transactions contemplated by this Agreement to be filed on behalf of Sellers after the Effective Date must be reasonably satisfactory in form and substance to both Purchaser and Sellers.

> 2.2.2    Sellers agree that they will promptly take such actions as are reasonably requested by Purchaser to assist in obtaining entry of the Bidding Procedures Order and if Purchaser is successful bidder at the Auction, the Sale Approval Order described in Section 3.1.

2.3.    Other Bids.    Purchaser acknowledges that, pursuant to the Bidding Procedures Order, Sellers will solicit bids from or more other prospective purchasers for the sale of some or all of the Purchased Assets in accordance with the procedures set forth in the Bidding Procedures Order.

2.4.    Break Up Fee.  If Purchaser is not the winning bidder at the Auction and if Sellers sells all or substantially all of the Purchased Assets described herein to another bidder unrelated to Purchaser, then at or immediately following Sellers's closing of such sale to another bidder, Sellers shall pay to Purchaser a break up fee in an amount equal to Sixty Nine Thousand Six Hundred and 00/100 Dollars ($69,600.00) (the "Break Up Fee") as a limited bid protection and as payment in full of due diligence costs and expenses; provided, however, that Sellers's obligation to pay the Break Up Fee shall be limited to the proceeds received by Sellers from a sale of some or all of the Sellers' Purchased Assets to another bidder at Auction unrelated to Purchaser.

2.5.    <u>Waiver of Challenge Rights</u>.  If, for any reason, Purchaser is not the successful bidder at the Auction and/or does not ultimately acquire the Purchased Assets at Closing, Purchaser agrees that, in consideration for the Break Up Fee and other consideration provided hereunder and under the Sale Motion and Bidding Procedures Order, it shall not challenge, attempt to prevent, hinder, delay or frustrate the Sellers' transfer of any or all of the Purchased Assets to another transferee, and Purchaser hereby irrevocably waives any all rights to the same.  Purchaser acknowledges that the Sellers' Purchased Assets will be irreparable harmed by the Purchaser's failure to comply with this provision of the Agreement and agrees that Sellers shall be entitled to equitable relief against Purchaser in the form of an injunction, specific performance, or otherwise.

## ARTICLE III – CLOSING, ITEMS TO BE DELIVERED, THIRD PARTY CONSENTS, AND FURTHER ASSURANCES

3.1    <u>Closing</u>.  The closing (the "<u>Closing</u>") of the sale and purchase of the Purchased Assets shall take place within ten (10) days after the later to occur of (a) the Court's entry of an order in the Cases approving the sale of the Purchased Assets to the Purchaser in accordance the outcome of the Auction (the "<u>Sale Approval Order</u>"), and (b) Purchaser's receipt of all necessary regulatory approvals, but in either event, no later than seventy-five (75) days after the entry of the Sale Approval Order, in accordance with Section 5.1, below.  The Closing shall be scheduled at a time and location agreed upon by Sellers and Purchaser.  The date of the Closing is sometimes herein referred to as the "<u>Closing Date</u>."

3.2    <u>Items to be Delivered at Closing</u>.      At the Closing, the following events will occur:

        (a)  <u>Bill of Sale</u>.  Sellers will deliver to purchaser the Bill of Sale, fully executed by Sellers, conveying to Purchaser all of the Sellers' right, title and interest in, to and under all personal property included in the Purchased Assets, free and clear of all mortgages, liens, pledges, security interests, charges, claims, restrictions and other encumbrances securing indebtedness.

        (b)  <u>Deed</u>.  Superior will deliver to Purchaser the Deed, fully executed by Superior and Purchaser, conveying to Purchaser all of Superior's right, title and interest in, to and under the land, improvements and fixtures included in the Purchased Assets, free and clear of all mortgages, liens, pledges, security interests, charges, claims, restrictions and other encumbrances securing indebtedness.

        (c)  <u>Payment</u>.  On the Closing Date, Purchaser shall pay the Purchase Price in immediately available funds, by release of the Purchaser's Deposit and by payment of the balance of the Purchase Price, subject to the credits and prorations provided for in this Agreement, by wire transfer

of immediately available funds to and account designated in writing by Sellers.

(d) Allocation of Purchase Price. At Closing, Sellers and Purchaser will allocate the Purchase Price in accordance with the provisions of Section 1060 of the Internal Revenue Code of 1986, as amended from time to time (the "Code"). Not less than ten (10) days prior to the Closing, Purchaser shall deliver in writing to Sellers setting forth its proposed allocation of the Purchase Price. Unless Sellers, not less than five (5) days prior to Closing, object in writing showing their rationale with detailed valid nursing home valuation principles as to why said allocation is improper, the Sellers shall be deemed to have agreed to Purchaser's allocation. If a timely objection is delivered and the parties cannot agree prior to the Closing regarding the allocation, such issue may be submitted to the Court for determination. The foregoing notwithstanding, the allocations contemplated herein shall not be binding on Sellers or any third party for any other purpose, including without limitation, for purposes of distribution to creditors in the Cases.

(e) Closing Certificate and Documents.

(i) Sellers shall deliver to Purchaser a certificate executed by a duly authorized representative of each Seller certifying as to the matters set forth in Section 6.1 and Section 6.2; and

(ii) Purchaser shall deliver to Sellers a certificate executed by a duly authorized representative of Purchaser certifying as to the matters set forth in Section 7.1 and Section 7.2.

(f) Execution and Delivery of Agreements. Sellers and Purchaser shall execute and deliver such other instruments, documents or agreements (in each case, in a form reasonably satisfactory to each such party) that are reasonably required in order to properly and orderly consummate, give effect to, and close the transactions contemplated by this Agreement. Simultaneously with such delivery, all such steps will be taken as may be required to put the Purchased Assets in actual possession and operating control of Purchaser.

(g) Such documents, certifications and statements as may be required by the Title Company to issue the Title Policy, the Title Endorsements, and any loan title policies to Purchaser's lender, including, without limitation, a copy of the Title Company Disbursement Statement signed by Sellers approving each and every one of the payments and disbursements made by the Title Company, through the closing escrow.

3.3.  Further Assurances.  Sellers from time to time after the Closing, at no cost to Sellers, upon Purchaser's request, will execute, acknowledge and deliver to Purchaser such other instruments of conveyance and transfer and will take such other actions as Purchaser may reasonable require in order to vest more effectively in the Purchased Assets and to implement the transaction contemplated by this Agreement.  Sellers reserve the right to seek or require advance approval of the Court with respect to any request from Purchaser under this Section 3.3.

3.4 Pre-Closing Covenants.

    a.    **Sellers' Covenants**.  Subject to the Bankruptcy Code, the Bidding Procedures Order or any other applicable orders of the Court with respect to each of the following subparagraphs, each Seller hereby agrees and covenants to Purchaser and New Operator that, unless otherwise indicated, between the Effective Date and the Closing Date, except as otherwise contemplated by this Agreement or with the prior written consent of Purchaser:

        i.    Between the Sale Order date and the Closing Date, Sellers will cooperate with Purchaser and New Operator in connection with their efforts to obtain the skilled nursing facility license for the Facility (the "License") and permitting New Operator to operate the Facility with 118 skilled nursing beds, and in that regard, Sellers agree, promptly upon request by Purchaser and New Operator, to execute any reasonable applications or notifications required in connection with such efforts. Sellers agree to promptly provide or make available to Purchaser and New Operator, upon request and to the extent such documentation is within Sellers's possession or control, any and all existing documentation requested by DHS or otherwise necessary for the issuance of the License.

        ii.    Between the Sale Order date and the Closing Date, Sellers shall use commercially reasonable efforts to assist Purchaser and New Operator in seeking timely to obtain any necessary third party consents for the valid conveyance, transfer, assignment or delivery of the Purchased Assets being transferred to Purchaser and New Operator per the terms of this Agreement, and Sellers specifically agree to provide reasonable cooperation to Purchaser and New Operator in connection with obtaining, enrolling or receiving an assignment of any provider agreement or third party payor contract related to the Facility.

        iii.    Sellers will not make any changes in the normal and ordinary operation of the Facility from the Effective Date through the Closing Date. Sellers shall not amend, revise or modify any existing lease for any of the Purchased Assets.  Sellers will ensure that the Facility will be operated in the ordinary course of business in the current manner, shall maintain the Facility and continue to make ordinary repairs, replacements and maintenance with respect to the Facility and the other Purchased

Assets and Sellers shall deliver the Purchased Assets on the Closing Date, free and clear of all liens, claims, charges and encumbrances, other than the Permitted Exceptions, in substantially the same condition and repair as in existence on the Effective Date.

iv.      Sellers will not make any material change in the operation of the Purchased Assets nor sell or agree to neither sell any items of machinery, equipment or other assets of the Purchased Assets nor otherwise enter into an agreement affecting the Purchased Assets other than in the ordinary course of business and consistent with past practices.

v.      There will be no change in ownership, operation or control of any of the Purchased Assets prior to Closing, and Sellers will not take any action inconsistent with its obligations under this Agreement.

vi.      Sellers will maintain in force or renew on commercially reasonable terms the existing hazard and liability insurance policies as are now in effect for all of the Purchased Assets.

vii.      Sellers will not, other than in the ordinary course of business and consistent with past practices after written consent from Purchaser or New Operator, enter into any new contract or commitment, or modify or reject any existing contract or commitment, affecting any part of the Purchased Assets after the Closing Date.

viii.      Sellers will maintain the inventories of perishable food, non-perishable food, central supplies, linen, housekeeping and other supplies at the Facility at substantially the same condition and quantity as presently maintained, but in no event less than required by Applicable Laws (as defined in Section 4.1.21 herein).

ix.      Between the Sale Order date and the Closing Date, during normal business hours and upon not less than twenty-four (24) hours prior notice, Sellers will provide Purchaser or New Operator and their representatives with access to the Facility and the Purchased Assets.

x.      Sellers will cause all of the Purchased Assets to be operated in compliance with all Applicable Laws, regulations and ordinances as are now in effect and take all actions reasonably necessary to achieve compliance with any laws, regulations and ordinances which are enacted after execution of this Agreement and prior to Closing, except to the extent it would not otherwise have a material adverse effect on the Property or require Sellers to make capital improvements to the Property.

xi.      Sellers will promptly notify Purchaser and New Operator in writing of any material adverse change of which Sellers become aware in

{1077/001/00114777.3}

11

the condition of the Purchased Assets, including, without limitation, delivery to Purchaser and New Operator within three (3) business days of receipt: (A) copies of any surveys and inspection reports from any governmental agencies received after the Effective Date; and (B) notices received of any action pending, threatened or recommended by the appropriate state or federal agency having jurisdiction thereof to revoke, withdraw or suspend any right of Sellers to operate the Facility, to terminate the participation of the Facility in the Title XVIII or Title XIX of the Social Security Act programs, to terminate or fail to renew any provider agreement related to the Facility, or to take any action that would have a material adverse effect on Purchaser's or New Operator's ability to purchase and operate the Facility as a skilled nursing facility.

## ARTICLE IV – REPRESENTATION AND WARRANTIES

4.1 <u>Representations and Warranties of Sellers</u>.  Sellers, hereby represents and warrants to Purchaser as follows:

   4.1.1      <u>Status and Good Standing</u>.    Each Seller is vested with full power and authority to enter into this Agreement.  Each Seller is a Georgia corporation, duly formed and validly existing under the laws of the State of Georgia, and are duly qualified to own and/or operate the Purchased Assets and to conduct business in the State of Wisconsin.

   4.1.2      <u>Authorization</u>.

      (a) The execution, delivery and performance by each of the Sellers of this Agreement and the other agreements to be entered into by them  pursuant to the terms of this Agreement, and the consummation by Sellers of the transaction contemplated hereby and thereby are within each Sellers's corporate powers (and will be in accordance with the powers granted to Sellers under the Sale Approval Order if and when used), are not in contravention of the terms of each Seller's documents of formation, and subject to obtaining the Sale Approval Order, have been duly authorized and approved by all necessary parties, tribunals, or individuals from whom such authorization and approval is required to consummate the transaction contemplated by this Agreement. Subject to obtaining the Sale Approval Order, no other corporate proceedings on the part of the Sellers are necessary to authorize the execution, delivery and performance of this Agreement or any other agreement to be entered into by Sellers pursuant to the terms of this Agreement.

      (b) Subject to the Sale Approval Order, this Agreement has been duly and validly executed and delivered by each Seller.  As of the Closing, the other agreements and instruments to be entered into or executed by Sellers

pursuant to the terms of this Agreement will have been duly and validly executed and delivered by Sellers.  Subject to obtaining the Sale Approval Order described in Section 2.2, this Agreement constitutes (and upon their execution and delivery by Sellers, the other agreements to be entered into pursuant to the terms of this Agreement by Sellers will constitute) the legal, valid and binding obligations of Sellers enforceable against Sellers in accordance with their respective terms (assuming the valid authorization, execution and delivery hereof and thereof by Purchaser) subject to bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

4.1.3    <u>No Third Party Options</u>.  To the actual knowledge of Sellers, there are no existing agreements, options, commitments, or rights with, of or to any person to acquire any of the Purchased Assets, or any interest therein.

4.1.4    <u>Validity of Contemplated Transactions</u>.  Subject to Sellers obtaining the Sale Approval Order from the Court, and except as otherwise set forth herein, delivery and performance of this Agreement by Sellers does not and will not violate, conflict, with or result in the breach of any term, condition or provision of, or require the consent of any other person under (a) any applicable existing law, ordinance, or governmental rule or regulation to which Sellers is subject, (b) any applicable judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental or regulatory official, body or authority which is applicable to Sellers, (c) the charter documents of Sellers, or (d) governmental approval, or other instrument, document or understanding, oral or written, to which Sellers is a party, by which Sellers may have rights or by which the Nursing Home may be bound or affected, or give any party with rights thereunder the right to terminate, modify, accelerate or otherwise change the existing rights or obligations of Sellers thereunder.  Except as aforesaid, subject to Sellers obtaining the Sale Approval Order from the Court, no authorization, approval or consent of, and no registration or filing with, any governmental or regulatory official, body or authority is required in connection with the execution, delivery or performance of this Agreement by Sellers.

4.1.5    <u>Sale Assets Complete and Lien Free</u>.    Pursuant to the Sale Approval Order, Sellers have good, valid and marketable title to the Purchased Assets, and subject to the terms and conditions of the Sale Approval Order if and when used, Sellers will transfer the terms and conditions of the Sale Approval Order if and when used, Sellers will transfer the Purchased Assets at Closing free and clear of all mortgages, liens, pledges, security interests, charges, claims, restrictions and other encumbrances securing indebtedness.

4.1.6    <u>Litigation</u>.  Aside from the matters listed on **Schedule 4.1.6**, and subject to entry of the Sale Approval Order, to the actual knowledge of Sellers, neither Seller is a party to or subject to the provisions of any judgment, order, writ, injunction, decree or award of

any court, arbitrator or governmental of regulatory official, body or authority which may adversely affect the transactions contemplated hereby.

4.1.7    <u>AS IS, WHERE IS</u>.  Sellers are selling the Purchased Assets to Purchaser, and Purchaser if buying the Purchased Assets from Sellers, on an  "AS IS, WHERE IS" basis as of the Closing and in their condition as of the Closing with "all faults," and Sellers and their affiliates and their respective representatives do not make, have not made, and will not make any representation of warranty, express or implied, at law or in equity, in respect of any Purchased Asset or the transactions contemplated hereby, except, (a) the representations and warranties set forth in this Section 4.1, and (b) and any warranties of title contained in the Deed and Bill of Sale.

4.1.8    <u>Contracts</u>.   Subject to the entry of the Sale Order, Seller has the power and authority to assign each of the Assigned Contracts and the Resident Agreements to Purchaser and/or New Operator.

4.1.9    <u>Hazardous Substances</u>.   To Sellers' knowledge, the Purchased Assets are not contaminated with any Hazardous Substances (as defined below) or regulated substances.  To Sellers' knowledge, Sellers have not generated, stored or disposed of any hazardous waste on the Purchased Assets except in such quantities that are customary and legal in the operation of a skilled living care facility.  For purposes of this Agreement, "<u>Hazardous Substances</u>" means any substance or material which gives rise to liability under any of the Environmental Laws (as defined below); but excludes hazardous substances typically used in, and in quantities necessary for, the day-to-day operation of the Facility and which are commonly used in other similar facilities, including, but not limited to, cleaning fluids, insecticides and medicines.  For purposes of this Agreement, "<u>Environmental Laws</u>" means the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq., the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Sections 9601 et seq., the Clean Water Act, 33 U.S.C. Section 1251 et seq., and all other applicable state, county, municipal, administrative or other environmental, hazardous waste or substance, health and/or safety laws, ordinances, rules, and regulations pertaining to the environmental or ecological conditions on, under or about the Purchased Assets.  To Sellers' knowledge, there are no underground storage tanks on the Purchased Assets.

4.1.10   <u>Personal Property, Supplies and Improvements</u>.   Except for any equipment or other items leased by Sellers and set forth in **Schedule 4.1.10**, all tangible rights, supplies, properties and assets used in the operation of the Facility as currently operated are owned by Seller and are included in the assets to be transferred hereunder.   All utility services, including heat, air conditioning, hot and cold water, telephones, gas and electricity are available at the Facility.  On the Closing Date, Seller will have available sufficient supplies to operate the Facility for not less than seven (7) days.

4.1.11 <u>Audits</u>.  To Sellers' knowledge, there are no current desk audits or full audits by CMS, DHS or any other applicable governmental regulatory agency in connection with any Medicaid or Medicare cost reports filed by Sellers.

4.1.12 <u>Licensure</u>.  The Facility is and shall on the Closing Date be licensed for 118 skilled nursing beds (the "<u>Licensed Beds</u>").  There are no pending actions or claims except as set forth in **Schedule 4.1.12** ("<u>Licensure Disclosures</u>"), or, to Sellers' knowledge, any threatened actions or claims, which, if adversely determined, could materially and adversely affect such license as of the Closing Date.  Other than with respect to the Licensure Disclosures, Sellers have not received any written notice from the DHS, or any other governmental agency requiring the correction of any condition with respect to such license which has not been the subject of a plan of correction and Sellers have no reason to believe that any such license is subject to termination.  Furthermore, Sellers have not received any written notice from DHS or any other governmental or quasi-governmental organization of any life safety code or similar violations which could materially and adversely affect the Facility's license, nor do Sellers have any knowledge that any condition exists at the Purchased Assets that would violate any life safety codes.  To the extent failure of compliance would cause a material adverse effect, Sellers shall promptly comply with any violation notices concerning the Facility received after the date hereof and before the Closing Date to the extent that any such notice requires compliance activities.  During the three (3) year period prior to the Closing Date, except as set forth in the Licensure Disclosures, Seller has not received with respect to the Facility any notice of termination of the License issued by DHS to operate the Facility to the extent of its Licensed Beds.

4.1.13 <u>Certification</u>.  Between the date of the Effective Date and the Closing Date, there shall not have been any material adverse change in the regulatory status and/or condition of any of Sellers' certifications for the participation in Medicare and Medicaid reimbursement programs, and the Medicare and Medicaid rates of the Facility.  Sellers have received no notice of termination for any participation in the Medicaid or Medicare reimbursement programs and has no reason to believe that the Facility will not be certified for participation in the Medicaid and Medicare reimbursement programs on the Closing Date.  Such certification is and shall on the Closing Date be in full force and effect and subject to no restrictions or limitations which would cause a material adverse effect on Sellers' participation in the Medicaid and Medicare reimbursement programs.  Except as listed in **Schedule 4.1.13**, there are no written claims, demands or other notices of action alleging the overpayment of Medicaid, Medicare or other governmental or quasi-governmental reimbursements or demands for the return of such alleged overpayments by any third party payor with respect to the Facility and/or any alleged underpayment of any tax and/or assessment, including but not limited to state bed tax or assessment.

4.1.14  <u>Insurability</u>.  Seller have not received written notice or request from any insurance company or underwriters setting forth any defects in the Purchased Assets which might affect the insurability thereof.

4.1.15  <u>Government Investigations</u>.  Except as listed in **Schedule 4.1.15,** Sellers have not received any notice of the commencement of any investigation proceedings or any governmental investigation or action (including any civil investigative demand or subpoena) under the False Claims Act (31 U.S.C. Section 3729 et seq.), the Anti-Kickback Act of 1986 (41 U.S.C. Section 51 et seq.), the Federal Health Care Programs Anti-Kickback statute (42 U.S.C. Section 1320a-7a(b)), the Ethics in Patient Referrals Act of 1989, as amended (Stark Law) (42 U.S.C. 1395nn), the Civil Money Penalties Law (42 U.S.C. Section 1320a-7a), or the Truth in Negotiations (10 U.S.C. Section 2304 et seq.), Health Care Fraud (18 U.S.C. 1347), Wire Fraud (18 U.S.C. 1343), Theft or Embezzlement (18 U.S.C. 669), False Statements (18 U.S.C. 1001), False Statements (18 U.S.C. 1035), and Patient Inducement Statute and equivalent state statutes or any rule or regulation promulgated by any governmental authority with respect to any of the foregoing healthcare fraud laws affecting Sellers with respect to the Facility.

4.1.16  <u>Violations</u>.  Sellers have not received notice with respect to the Facility that it has been charged or implicated in any violation of any state or federal statute or regulation involving false, fraudulent or abusive practices relating to their participation in state or federally sponsored reimbursement programs, including but not limited to false or fraudulent billing practices.

4.1.17  <u>Life Care Contracts</u>.  Neither either of the Sellers nor the Facility is a party to any life care contract with respect to any resident of the Facility.

4.1.18  <u>Resident Transfers</u>.  There shall be no transfer of residents from the Facility to a skilled nursing facility owned or operated by Sellers or an affiliate of Sellers, nor shall there be any voluntary transfers by Sellers of residents from the Facility to any other nursing facility, where such transfer is not in the ordinary course of business and not for reasons relating to the health and wellbeing of the resident transferred or otherwise required by law.

4.1.19  <u>Material Adverse Change</u>.  No material adverse change has occurred in the census, physical condition or business of the Facility or Purchased Assets, whether financial or otherwise.  Without limiting the generality of the foregoing, it is acknowledged that a decrease of ten percent (10%) of the census at the Facility since the Effective Date, shall constitute a material adverse change.

4.1.20  <u>Supplies and Personal Property</u>.  Unless specifically permitted pursuant to the terms of this Agreement, Sellers shall not remove any supplies or items of personal property from the Facility.  Except for the Resident Trust Funds, Sellers do not have possession of any other personal property owned by residents at the Facility.

{1077/001/00114777.3}

16

4.1.21  <u>Compliance with Applicable Laws</u>.  The Purchased Assets (including any parking areas or facilities) have been and are presently used and operated in material compliance with, and in no way violate in any material respects any applicable statute, law, regulation, rule, licensing requirement, ordinance, order or permit of any kind whatsoever affecting the Purchased Assets or any part thereof, including without limitation, any statutes or laws pertaining to the services and care provided for the residents at the Facility, and any rules or regulations promulgated thereunder ("<u>Applicable Laws</u>"), or any Permitted Exceptions.  In addition, no waivers have been obtain or are required to make the representations contained in this <u>Section 4.1.21</u> true and correct in all material respects.

4.1.22  <u>Residents</u>.  The information set forth in the Resident Agreements and patient rolls pertaining to residents of the Facility is true and correct in all material respects as of the respective dates of such Resident Agreements and patient rolls.

4.1.23  <u>Multi-Employer Plans</u>.  Except as disclosed on **Schedule 4.1.23**, the Facility does not have a multi-employer plan, as defined in Section 3(37) of the Employee Retirement Income Security Act of 1974, as amended from time to time ("<u>ERISA</u>").

4.1.24  <u>Employee Benefit Plans</u>.  Except as disclosed on **Schedule 4.1.24:**

> i.      Sellers do not maintain or contribute to any non-qualified deferred compensation or retirement plans, contracts or arrangements;

> ii.     Sellers do not maintain or contribute to any qualified defined contribution plans (as defined in Section 3(34) of ERISA, or Section 414(i) of the Code);

> iii.    Sellers do not maintain or contribute to any qualified defined benefit plans (as defined in Section 3(35) of ERISA or Section 414(j) of the Code);

> iv.     Sellers do not maintain or contribute to any employee welfare benefit plans (as defined in Section 3(1) of ERISA); and

> v.      Sellers have not entered into, nor have Sellers established or maintained any change-in-control or severance agreements or plans.

4.1.25  <u>HIPAA</u>.  Sellers have not received notice that, with respect to the Facility, they are not in material compliance with the Health Insurance Portability and Accountability Act of 1996, as amended from time to time ("<u>HIPPA</u>"), and its implementing regulations.

4.2   <u>Representations and Warranties of Purchaser</u>.  Purchaser represents and warrants to Sellers as follows:

4.2.7      <u>Company Existence</u>.  Purchaser is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware.

4.2.8      <u>Company Power and Authorization</u>.

(a) The execution, delivery and performance by Purchaser of this Agreement and the other agreements to be entered into by it pursuant to the terms of this Agreement, and the consummation by Purchaser of the transaction contemplated hereby and thereby are within Purchaser's company powers, are not in contravention of the terms of Purchaser's respective documents of formation, and have been duly authorized and approved by the members of Purchaser.  No other company proceedings on the part of Purchaser are necessary to authorize the execution, delivery and performance of this Agreement or any other agreement to be entered into by Purchaser pursuant to the terms of this Agreement.

(b)   This Agreement has been duly and validly executed and delivered by Purchaser.  As of the Closing, the other agreements and instruments to be entered into or executed by Purchaser pursuant to the terms of this Agreement will have been duly and validly executed and delivered by Purchaser.  This Agreement constitutes (and upon their execution and delivery by Purchaser the other agreements to be entered into pursuant to the terms of this Agreement by Purchaser will constitute) the legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms (assuming the valid authorization, execution and delivery hereof and thereby by Sellers).

4.2.3      <u>Validity of Contemplated Transactions, etc.</u> The execution, delivery and performance of this Agreement by Purchaser does not and will not violate, conflict with or result in the breach of any term, condition or provision of, or require the consent of any party to, (a) any existing law, ordinance, or governmental rule or regulation to which Purchaser is subject, (b) any judgment, order, writ, injunction, decree, or award of any court, arbitrator or governmental or regulatory official, body or authority which is applicable to Purchaser, or (c) the charter documents of Purchaser.  Except as aforesaid, no authorization, approval or consent of, and no registration or filing with, and governmental or regulatory official, body or authority is required in connection with the execution, delivery and performance of this Agreement by Purchaser.

4.2.4   <u>Sufficiency of Funds</u>.  Purchaser has unencumbered cash on hand or credit arrangements with financially responsible third parties, or a combination thereof, in an aggregate amount sufficient to enable Purchaser to pay the Purchase Price and all other amounts payable by Purchaser in connection with this Agreement and the transactions provided for within.

4.2.5    Due Diligence.  During the period commencing on the Effective Date and ending at 5 p.m. prevailing Eastern time on January 23, 2015 (the "Due Diligence Period"), Purchaser shall have the right to conduct such due diligence as Purchaser deems reasonably necessary in order to proceed with the Auction with the intent of purchasing the Purchased Assets in accordance with the Agreement. Upon the expiration of the Due Diligence Period, this Agreement shall become irrevocably binding on Purchaser in accordance with its terms, and any matters, conditions, circumstances, events records or other matters of information of any kind whatsoever discovered subsequently by Purchaser with respect to the Purchased Assets shall be deemed irrevocable waived and shall not entitle Purchaser to terminate this Agreement or fail to perform its obligations hereunder.

## ARTICLE V – AGREEMENTS PENDING CLOSING

5.1 Agreements of Purchaser Pending the Closing.  Purchaser will use its reasonable best efforts to cause all of the conditions to the obligations of Purchaser and Sellers under this Agreement to be satisfied with seventy-five (75) days after the Court's issuance of the Sale Approval Order.  Without limiting the generality of the foregoing, and in supplementation thereof, Purchaser covenants and agrees that, pending the Closing and except as otherwise agreed to in writing by Sellers, Purchaser shall cooperate with Sellers to cause all of the conditions to the obligations of Purchaser and Sellers under this Agreement to be satisfied within the time specified above and will not knowingly take any action that would result in a breach of any of its representations and warranties hereunder.

5.2 EMPLOYEES.

a.    **Sellers' Employees**.  Sellers shall terminate the employment of all employees providing services at the Facility (the "Current Employees") as of the Closing Date.  Neither Purchaser nor New Operator shall be bound by or assume any employment contracts to which Sellers may be a party.  Sellers shall not make any material changes in the compensation or benefits of the employees at the Facility prior to the Closing Date, except raises (not to exceed three percent (3%)) on dates and in amounts consistent with past practices, with respect to which written notice shall be provided to New Operator.  Purchaser and/or New Operator may, in their sole and absolute discretion, after being selected the successful bidder at the Auction, on or before the Closing Date, meet with the employees to have them complete any necessary employment and enrollment forms.

b.    **Retained Employees**.  Except as disclosed to Sellers prior to the Closing Date, commencing on the Closing Date Purchaser or New Operator shall rehire or offer to rehire such Current Employees (the "Retained Employees") at wages and benefits sufficient to avoid the applicability of the Workers

Adjustment and Retaining Notification Act, 29 U.S.C. § 2101 (the "WARN Act"). Nothing in this paragraph, however, shall create any right in favor of any person not a party hereto, including without limitation, the Current Employees, or constitute an employment agreement or condition of employment for any employee of Sellers or any affiliate of Sellers who is a Retained Employee. On and after the entry of the Sale Order, Purchaser and New Operator shall have access to the Current Employees which it intends to make Retained Employees for reasonable training of such employees, provided that such training shall not materially distract from the ordinary operation of the Facility.

c. **Payroll and Benefit Obligations**. Pursuant to Section 1.7(d), Seller will provide a credit at Closing to Purchaser for the payment of the estimated accrued wages, salaries, bonuses, employment taxes, withholding taxes, accrued vacation days, sick days and personal days and related obligations for the Current Employees of the Facility up to the Closing Date that are Retained Employees ("PTO"). In exchange therefore, New Operator agrees to pay when and as due, all of such PTO, provided, however, except for the PTO, New Operator shall not be liable on account of any and all other liabilities and obligations with regard to any of the Current Employees. A schedule of PTO is attached hereto as **Schedule 5.2.c**. Seller agrees to give all affected Current Employees written notice of termination of participation of Current Employees working at the Facility in any applicable 401(k) or other pension or retirement plan; any medical, dental, vision or retiree benefit plan; any severance pay plan; any bonus, paid time off, vacation, holiday or sick leave plan; any employment agreement and any other plan affecting the Current Employees. Purchaser and New Operator shall be responsible for all requirements and obligations of and for any and all liability under local, state or federal laws, regulation or statute, to the extent it governs the termination of any employees that are not Retained Employees as related to the number of employees terminated, including, without limitation, the WARN Act.

d. **Employment Records**. Sellers shall leave at the Facility either the originals or full and complete copies of all employee records for all Retained Employees in their possession (including, without limitation, all employee employment applications, W 4's, I 9's and any disciplinary reports) (collectively, the "Employee Records").

## ARTICLE VI – CONDITIONS PRECEDENT TO CLOSING OBLIGATIONS OF PURCHASER

All obligations of Purchaser under this Agreement are subject to the fulfillment or satisfaction, prior to or at the Closing, of each of the following conditions precedent:

6.1    Regulatory Approvals. Purchaser, New Operator, or their affiliate's receipt of approval from the applicable governmental authorities for the issuance of the

authorizations, consents, licenses or permits identified on **Schedule 6.1.a** (each, a "Regulatory Approval").   **Schedule 6.1.a** has been prepared by Purchaser and New Operator with the agreement and understanding that other than as shown on **Schedule 6.1.a**, there are no other consents, licenses, permits, or approvals of any other governmental agencies or entities which are conditions precedent to the obligations of Purchaser and New Operator to consummate the transaction which is the subject of this Agreement.  Purchaser and New Operator will not seek any authorizations, consents, licenses, permits, or approvals of governmental agencies or entities other than those shown on **Schedule 6.1.a**, if doing so would reasonably be expected to cause a delay in Purchaser's and New Operator's ability to obtain prior to the Closing those Regulatory Approvals listed on **Schedule 6.1.a**.

6.2      Representation and Warranties True as of the Closing Date.  The representation and warranties of Sellers contained in this Agreement of in any schedule, pursuant to the provisions hereof shall be true on the Closing Date with the same effect as though such representations and warranties were made as of such date.

6.2      Compliance with the Agreement.   Sellers shall have performed and complied in all material respects with all agreements and conditions required by this Agreement to be performed or complied with by Sellers prior to or at the Closing.

6.3      General Assignment.   Sellers shall have assigned to Purchaser and/or New Operator, in substantially the form attached as Exhibit "E" hereto, all of Sellers' right, title and interest in, to and under: (a) the Assumed Contracts; (b) the Resident Trust Funds; (c) the Medicaid and/or Medicare provider agreements, to the extent permitted by Applicable Laws; (d) the Resident Agreements; and (e) the present telephone numbers, any websites and internet domain names of the Facility.

6.4      Threatened or Pending Litigation.   On the Closing Date, aside from the Cases, no other suit, action or other proceeding, or injunction of final judgment relating thereto, shall be threatened or be pending before any court or governmental body in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby, and no investigation that might result in any such suit, action or proceeding shall be pending or threatened, which, in either case,  are not subject to the automatic stay under 11 U.S.C. §362.  No action or proceeding has been instituted or to Sellers' knowledge threatened before any court or governmental body or authority the result of which could materially and adversely affect New Operator's ability to operate the Facility as a nursing home with the same number and type of Licensed Beds as currently existing at the Facility. There are no orders which are entered after execution of this Agreement and prior to Closing and which shall result in the immediate forced closing of the Facility prior to the Closing Date.

6.5      Auction Result.  Purchaser shall have been the successful bidder at the Auction.

6.6    <u>Court Approval</u>.  The Court shall have issued the Sale Approval Order in the form of a final order approving the sale of the Purchased Assets to Purchaser.

6.7    <u>Title Insurance</u>. Purchaser shall have received insurable fee simple title to the Purchased Assets, subject only to the Permitted Exceptions, which the Title Company will insure at least to the extent of the amount of the Purchase Price under the Title Policy, in accordance with the requirements of this Agreement.

6.8    <u>No Material Change</u>.  Since the date of this Agreement, no material adverse change shall have occurred in the census, physical condition or business of the Facility, Sellers or the Purchased Assets, whether financial or otherwise.

6.9    <u>Purchased Assets</u>.  All Purchased Assets shall be located at the Facility on the Closing Date.

6.10    <u>Existing Leases</u>.  Any existing leases shall be terminated, except the Resident Agreements.

## <u>ARTICLE VII – CONDITIONS PRECEDENT TO CLOSING OBLIGATION OF SELLERS</u>

All obligations of Sellers under this Agreement are subject to the fulfillment or satisfaction, prior to or at the Closing, of each of the following conditions precedent:

7.1    <u>Representations and Warranties True as of the Closing Date.</u>  The representations and warranties of Purchaser contained in this Agreement or in any list, certificate or document delivered by Purchaser to Sellers pursuant to the provisions hereof shall be true on the Closing Date with the same effect as though such representations and warranties were made as of such Date with the same effect as though such representations and warranties were made as of such date.

7.2    <u>Compliance With This Agreement</u>.  Purchaser shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by Purchaser prior to or at the Closing.

7.3    <u>No Threatened or Pending Litigation</u>.  On the Closing Date, aside from the Bankruptcy Proceeding, no other suit, action or other proceeding, or injunction or final judgment relating thereto, shall be threatened or be pending before any court or governmental body in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby, and no investigation that might result in any such suit, action or proceeding shall be pending or threatened which, in either case,  are not subject to the automatic stay under 11 U.S.C. §362.

7.4    <u>Constituent Documents</u>.    Purchaser shall have delivered to Sellers true and complete copies of Purchaser's documents of formation.

7.5    <u>Auction Result</u>.    Purchaser shall have been the successful bidder at the Auction.

7.6    <u>Court Approval</u>.    The Court shall have issued the Sale Approval Order in the form of a final order approving the sale of the Purchased Assets to Purchaser.

## <u>ARTICLE VII – POST CLOSING MATTERS</u>

8.1    <u>Medicare/Medicaid Issues</u>.    As appropriate before or after the Closing, Sellers shall cooperate with Purchaser, at no cost to Sellers, to effect an orderly change of ownership in respect to licensed and Medicare and Medicaid program certification, if any, including, but not limited to, Purchaser's completion and execution of all such documents as are necessary after the Closing to permit Purchaser to apply for a license, or transfer of a license, from the State of Wisconsin.

8.2    <u>Transfer of Medical Records</u>.    On the closing Date, the parties agree that Sellers shall transfer to Purchaser the medical records (which shall include x-rays and other films and reports, notes, lab test results, and any and all documents relating to patients) of any patient residing or seen regularly and primarily at the Facility (the "<u>Medical Records</u>"). On the Closing Date, the Medical Records shall become the exclusive property of Purchaser to the extent permitted by Applicable Laws, rules and regulations.

8.3    <u>Maintenance of Medical Records; Indemnity</u>.    From and after receipt of any Medical Records pursuant to this Agreement, Purchaser covenants that New Operator shall be solely responsible for maintaining the Medical Records so transferred and providing them upon the lawful request of a patient (or other third party in accordance with all Applicable Laws, rules and regulations. Purchaser covenants New Operator shall maintain the Medical Records for each patient for a period of not less than ten (10) years after the last date of service with respect to such patient. After the Closing Date, Sellers shall have no obligation to maintain any Medical Records or respond to any request for Medical Records, which obligations shall be the sole responsibility of New Operator. Purchaser agrees to indemnify, defend and hold Sellers harmless for any and all claims by third parties arising out of or related to the transfer or maintenance of the Medical Records, including without limitation, Purchaser's failure to comply with any laws or regulations relating to the Medical Records.

8.4    <u>Compliance.</u>    The parties acknowledge and recognize their status, responsibilities and obligation as health care providers and covered entities, as those terms are defined in the privacy and security regulations issued under HIPAA, and contained in 45 C.F.R. Parts 160 and 164 (the "<u>Regulations</u>").    The parties agree to comply therewith (and, in particular, Section 164.506 of the Regulations, which provides, *inter alia*, the permitted uses and disclosures of protected health information for the purposes of another covered

entity's treatment, payment or health care operations) as well as all other federal and state laws and regulations, in the execution and operation of this Agreement.

8.5    Access to Purchased Assets.  Sellers shall be entitled to retain copies of any and all of the books and records of the Purchased Assets following the Closing and to use the information contained therein for all purposes relating, directly or indirectly, to the Cases and the winding down of the Sellers' Bankruptcy Estates.  In addition to the foregoing, Purchaser shall afford Sellers reasonable access, upon reasonable notice during normal business hours or at other reasonable times, to books and records included within the Purchased Assets in order for Sellers to administer and wind down their Bankruptcy Estates.

## ARTICLE IX – MISCELLANEOUS

9.1    Use of Name, Telephone Number and Internet Domain.  New Operator may use the current name, internet domain name and present telephone and facsimile numbers of the Facility.  Sellers shall as of the Closing Date cooperate with New Operator in its transfer, at New Operator's expense, of all right, title and interest, if any, in and to the names currently in use at the Facility, or any derivations thereof, and the telephone and facsimile numbers used by the Facility.

9.2    Policy and Procedure Manuals.  Sellers agree to make available to Purchaser and/or New Operator the policy and procedure manuals used for the Facility on the Closing Date and leave it available for thirty (30) days thereafter.

9.3    Accounts Receivable; Accounts Payable.

     a.    **Pre-Closing Receivables**.  Sellers shall retain the right to collect all unpaid accounts receivable as of the close of business on the day prior to the Closing Date with respect to the Facility, but only to the extent that such accounts receivable relate to services rendered prior to the Closing Date.

     b.    **Undesignated Receivables**.  The parties acknowledge that substantially all remittance advices related to Medicare and Medicaid reimbursement designate a period of service.  To the extent Sellers receive any payments for accounts receivable and the accompanying remittance advice or other payer designation does not indicate the period to which a payment relates or if there is no accompanying remittance advice or other payer designation and if the parties do not otherwise agree as to how to apply such payment, then, the parties will be deemed to have agreed that: (a) any undesignated payments received during the first sixty (60) days after the Closing Date shall be applied first to pre-Closing Date balances until such balances have been reduced to zero, and any remaining portion shall be applied to post-Closing Date balances and (b) any undesignated payments received after the sixtieth (60th) day after the Closing Date shall be applied first to post-Closing Date balances until such balances as of

the date of funds' application have been reduced to zero, with any remaining portion applied to any existing pre-Closing Date balances.

     c.    **Post-Closing Receivables**.  If at any time after the Closing Date, Sellers shall receive any payment from any federal or state agency or any other party for services rendered at the Facility after the Closing Date, then Sellers shall be obligated to remit such payments (or an amount equal to such payments) to New Operator within five (5) business days.

     d.    **Funds Held In Trust**.  To the extent either party receives any payments for accounts receivable of the other party, both parties acknowledge that the party receiving the payment belonging to the other party shall hold the payment in trust, that neither party shall have any right to offset with respect to such accounts receivable, and that the party erroneously receiving the payment shall have no right, title or interest whatsoever in the payment and shall remit the same to the other within five (5) business days after such receipt.

     e.    **Accounts Payable**.  All accounts payable for services provided or goods furnished for or at the Facility prior to the Closing Date shall remain the sole responsibility and obligation of Sellers.  All accounts payable for services provided or goods furnished for or at the Facility on or after the Closing Date shall be the sole responsibility and obligation of Purchaser or New Operator, as applicable.  To the extent accounts payable have been accrued for a period that includes time both before and after the Closing Date, the parties hereto shall apportion the responsibility for payment of the same on a pro rata basis.  The parties hereto hereby agree to cooperate with each other and notify the merchants, suppliers or other third parties with respect to which of Sellers or New Operator bears responsibility for accounts payable of the Facility based on the foregoing clauses.

9.4    <u>Casualty; Condemnation</u>.

     a.    **Notice**.  Sellers shall promptly notify Purchaser and New Operator of any casualty damage it becomes aware of or notice of condemnation that Sellers receive prior to the Closing Date.

     b.    **Non Substantial Damage from Casualty**.  If: (A) any portion of the Purchased Assets is damaged by fire or casualty after the Effective Date and is not repaired and restored substantially to its original condition prior to Closing, and (B) at the time of Closing the estimated cost of repairs is Five Hundred Thousand Dollars ($500,000) or less, as determined by an independent adjuster, and (C) for other reasons Purchaser have not otherwise elected to terminate pursuant to Section 9.5, Purchaser shall be required to purchase the Purchased Assets in accordance with the terms of this Agreement and at Sellers' option, (x) Purchaser shall receive a credit at Closing of the estimated cost of repairs determined by the aforesaid independent adjuster and Sellers shall retain all

insurance claims and proceeds with respect thereto; or (y) at Closing Sellers shall: (1) assign to Purchaser, without recourse, all insurance claims and proceeds with respect thereto (in which event Purchaser shall have the right to participate in the adjustment and settlement of any insurance claim relating to said damage), and (2) credit Purchaser at Closing with an amount equal to Sellers' insurance deductible.    Sellers shall have no liability or obligation with respect to the quantity or condition of the Purchased Assets and shall be released from any representation and warranty regarding same as a result of such fire or casualty.

       c.      **Substantial Damage from Casualty**.  If, at the time of Closing, the estimated cost of repairing such damage is more than Five Hundred Thousand Dollars ($500,000), as determined by such independent adjuster, Purchaser and New Operator may, at their sole option: (i) terminate this Agreement by notice to Sellers within fifteen (15) days after such casualty (which shall be deemed a termination by Purchaser pursuant to Section 9.5.1(b) of this Agreement); or (ii) proceed to Closing in accordance with this Agreement in accordance with Section 9.4(b).

       d.      **Condemnation**.  If, prior to Closing, a "material" portion of the Property is taken by eminent domain, then Purchaser and New Operator shall have the right within fifteen (15) days after receipt of notice of such material taking to terminate this Agreement, (which shall be deemed a termination by Purchaser pursuant to Section 9.5.1(b) of this Agreement).  If Purchaser and New Operator elect to proceed and to consummate the purchase despite said material taking (such election being deemed to have been made unless Purchaser notify Sellers in writing to the contrary within fifteen (15) days after notice from Seller to Purchasers of any taking), or if there is less than a material taking prior to Closing, there shall be no reduction in or abatement of the Purchase Price and Purchaser shall be required to purchase the Purchased Assets in accordance with the terms of this Agreement, and Sellers shall assign to Purchaser, without recourse, all of Sellers' right, title and interest in and to any award made or to be made in the eminent domain proceeding (in which event Purchasers shall have the right to participate in the adjustment and settlement of such eminent domain proceeding).  For the purpose of this section, the term "material" shall mean any taking of in excess of ten percent (10%) of the square footage of the Facility or twenty percent (20%) of the real property associated with the Facility, which would: (i) adversely affect Purchaser's or New Operator's ability after said taking to operate the Facility in compliance with the Licenses with the same number of beds at the applicable Facility as are existing as of the date of this Agreement; or (ii) eliminate after said taking a means of egress and ingress to and from the Facility to a public right of way; or (iii) cause the use of the Facility after said taking to no longer be in compliance with all applicable zoning and building rules, regulations and ordinances.

9.5    Termination.

9.5.1    Anything herein or elsewhere to the contrary notwithstanding, this Agreement may be terminated by written notice of termination at any time before the Closing Date (a) by mutual consent of Sellers and Purchaser or (b) by either party as a result of the other party's failure to meet the conditions precedent to Closing contained herein in a timely manner or if such party is in breach of its obligations to consummate the transaction contemplated by this Agreement pursuant to the terms hereof, but only if the defaulting party fails to meet such condition or cure such breach with ten (10) days after receipt of written notice of such failure from the non-defaulting party delivered in accordance with Section 9.10.

9.5.2    Purchaser or Sellers may terminate this Agreement if the Court or any other court of competent jurisdiction shall have issued an order, decree or ruling or taken any other action enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree or other action shall have become final and nonappealable.

9.5.3    In the event of the termination and abandonment thereof pursuant to the provisions of this section 9.1, this Agreement (except where otherwise provided herein) shall become void and have no effect, without any liability on the part of any of the parties or their directors, officers or equity holders in respect of this Agreement.

9.5.4    In the event of Purchaser's termination of this Agreement pursuant to Section 9.5.1(b), the Purchaser's Deposit shall be returned to Purchaser.

9.6    Sales, Transfer and Documentary Taxes, Etc.    In addition to the cost of requisite approvals necessary for Purchaser to obtain the licenses to operate the contemplated business, which shall be the sole responsibility of the Purchaser, Purchaser shall pay all federal, state and local sales, documentary and other transfer taxes, if any, due as a result of the purchase, sale or transfer of the Purchased Assets in accordance herewith whether imposed by law on Purchaser or sellers of the Facility, and Purchaser shall file all necessary returns, reports and other documentation, if any, required by Applicable Laws with respect to such taxes.  Further, Purchaser agrees to indemnify, reimburse and hold harmless Sellers in respect of the liability for payment of or failure to pay any such taxes or the filing of or failure to file any reports required in connection herewith.

9.7    Expenses.    Except as otherwise provided in this Agreement, each party hereto shall pay its own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the transactions contemplated hereby.

9.8    Contents of Agreement; Parties in Interest, Etc.    This Agreement sets forth the entire understanding of the parties hereto with respect to the transactions contemplated

hereby.  It shall not be amended or modified except by written instrument duly executed by each of the parties hereto.  Any and all previous agreements and understandings between or among the parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.

9.9    <u>Assignment and Binding Effect</u>.      Except for an assignment by the Purchaser to an affiliate, this Agreement may not be assigned prior to the Closing by any party hereto without the prior written consent of the other parties; provided, that any such affiliate first agrees in writing to be bound by all the terms, conditions and provisions contained herein, and provided, further, that Purchaser shall remain primarily liable for its obligations under this Agreement.  Subject to the foregoing, all of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the successors and permitted assigns of Sellers and Purchaser.

9.10    <u>Notice.</u>        Any and all notices given in connection with this Agreement shall be deemed adequately given only if in writing and personally delivered, sent by first class registered or certified mail, postage prepaid, return receipt requested, sent by overnight national courier service, sent by facsimile, provided a hard copy is mailed on that day to the party for whom such notices are intended or sent by other means at least as fast and reliable as first class mail a written notice shall be deemed to have been given to the recipient party on the earlier of (a) the date it shall be delivered to the address required by this Agreement, (b) with respect to a facsimile, the date on which the facsimile is sent.  Any and all notices referred to in this Agreement, or which any party desires to give the other shall be addressed as follows:

|  |  |
|---|---|
| To Purchaser: | Superior WI Realty, LLC |
|  | c/o Paragon Healthcare Group |
|  | 71-50 Parsons Blvd. |
|  | Suite 1001 |
|  | Fresh Meadow, New York 11365 |

With a copy to (which shall not constitute notice):

Stacy J. Flanigan
Gutnicki LLP
4711 Golf Road, Suite 200
Skokie, Illinois 60076

|  |  |
|---|---|
| To Sellers: | Superior Healthcare Investors, Inc. |
|  | 3000 Old Alabama Rd., Suite 119-149 |
|  | Alpharetta, Georgia  30022 |

With a copy to (which shall not constitute notice):

Frank Nason
Lamberth, Cifelli, Stokes, Ellis & Nason, P.A.
3343 Peachtree Road, N.E.
Suite 550
Atlanta, Georgia  30326

To Sellers:        HP/Superior, Inc.
3000 Old Alabama Rd., Suite 119-149
Alpharetta, Georgia  30022

With a copy to (which shall not constitute notice):

Ashley R. Ray
Scroggins & Williamson, P.C.
127 Peachtree Street, N.E.
Suite 1500
Atlanta, Georgia  30303

9.11    Governing Law.        This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the State of Georgia.

9.12    Jurisdiction; Venue.    Any legal action or proceeding relating to any disputes between the parties hereto arising under this Agreement or with respect to its subject matter shall be brought exclusively in the Court and, by execution and delivery of this Agreement, Purchaser hereby accepts for itself and its affiliates, generally and unconditionally, the jurisdiction of the aforesaid court.   The parties hereto hereby irrevocably waive any objection, including any or based on the ground of forum non-conveniens which any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdiction.

9.13    Waiver of Jury Trial.  THE PARTIES HERETO HEREBY  (1) IRREVOCABLY AND UNCONDITIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING OR COUNTERCLAIM OF ANY TYPE AS TO ANY MATTER ARISING DIRECTLY OR INDIRECTLY OUT OF OR WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH AND (2) AGREE THAT ANY PARTY MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED FOR AGREEMENT BETWEEN THE PARTIES IRRECVOCABLY TO WAIVE TRIAL BY A JURY, AND THAT ANY DISPUTE OR CONTROVERSY OF ANY KIND WHATSOEVER BETWEEN THEM SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

{1077/001/00114777.3}

9.14    <u>Schedules and Exhibits</u>.      All exhibits and schedules referred to herein are intended to be and hereby and specifically made a part of this Agreement.  The parties hereto agree that the party charged with providing an exhibit or schedule to this Agreement shall, to the extent necessary after delivery thereof, amend or supplement all exhibits and schedules in order for the same to be current, true and correct as of the Closing Date; provided, however, that the receiving party shall have five (5) days to review and object to such supplement in writing if such supplement would give rise to a termination under Section 9.1.5(b).  Failure to receive written objection within such five (5) days shall be deemed consent.

9.11    <u>Severability.</u>    Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

9.12    <u>Entire Agreement</u>.    This Agreement and the exhibits and schedules attached hereto constitute the entire Agreement between the parties with regard to the subject matter hereof.  No other understanding, inducement, representation or agreement shall be of any force or effect except as otherwise specifically provided for or referred to herein. This Agreement may not be altered or amended except in writing signed by all parties.

9.13    <u>Waiver</u>.   The failure of any party to insist assist upon strict compliance with any of the provisions of this Agreement by another party shall not constitute a waiver of such party's right to demand exact compliance with said provisions.

9.14    <u>Execution by Counterpart Originals</u>.    This agreement may be executed in one (1) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute the same instrument.

9.15    <u>Survival</u>.    All warranties, representations, obligations, duties, undertakings and Agreements made herein by any party, shall be true and correct as of the date of Closing, and, to the extent not satisfied at Closing, shall survive the Closing and the delivery of any bills of sale or documents of conveyance for a period of twelve (12) months from the Closing, and shall not be merged therewith.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first above written.

**SELLERS:**

**SUPERIOR HEALTHCARE INVESTORS, INC.**

By: _____
Name: _Doug McMeehan_____
Its: _President_____

**HP/SUPERIOR, INC.**

By: _____
Name: _Doug McMeehan_____
Its: _President_____

**PUCHASER:**

**SUPERIOR WI REALTY, LLC**

By_____
Name: Philip Friedman
Its:

**Acknowledged by**

**NEW OPERATOR:**

**SUPERIOR WI MANAGEMENT, LLC**

By_____
Name: Philip Friedman
Its:

{1077/001/00114777.3}

*Signature Page to APA*

**EXHIBIT 2**

**IDENTIFICATION OF ASSIGNED CONTRACTS AND PROPOSED CURE COSTS**

| Contract | Cure Amount |
|---|---|
| Royalton Manor, LLC<br>B8 Aspen Court<br>Superior, WI 54880<br>Kitchen space and equipment lease | $0.00 |

## CERTIFICATE OF SERVICE

This is to certify that on this date I served a true and correct copy of the attached **DEBTORS' MOTION (A) FOR AUTHORITY TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES (B) TO ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS; (C) TO ESTABLISH PROCEDURES WITH RESPECT TO SUCH SALE AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS, (D) TO CONSIDER APPROVAL OF BREAKUP FEE, AND (E) TO SHORTEN AND LIMIT NOTICE** by causing same to be deposited in the United States Mail with adequate postage affixed thereon and addressed to the following persons:

David S. Weidenbaum
Office of the United States Trustee
362 Richard B. Russell Federal Building
75 Spring Street, S. W.
Atlanta, Georgia 30303

F. Mark Bromley, AAG
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI  53707-7857

Kevin A. Stine
Baker Donelson Bearman Caldwell & Berkowitz P.C.
3414 Peachtree Road, NE
Atlanta, GA 30326

This 14th day of January, 2015.

SCROGGINS & WILLIAMSON, P.C.

1500 Candler Building
127 Peachtree Street, NE          _/s/ Ashley R. Ray_____
Atlanta, GA 30303                 J. ROBERT WILLIAMSON
T:    (404) 893-3880              Georgia Bar No. 765214
F:    (404) 893-3886              ASHLEY REYNOLDS RAY
E:    rwilliamson@swlawfirm.com   Georgia Bar No. 601559
      aray@swlawfirm.com

                                  *Counsel for HP/ Superior, Inc.*